UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CANDICE E. TESTA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 04-185-B-W |
| TOWN OF MADISON, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Candice E. Testa, former Town Clerk and Treasurer of the City of Madison, has sued her former employer based on allegations that she was terminated by the Town in retaliation for engaging in whistleblower activity and exercising her free speech rights concerning matters related to the operation and organization of the Town's municipal offices. Testa also maintains that the Town violated her due process rights. I conclude herein that Testa has failed to adduce sufficient evidence to generate a trial-worthy issue and, therefore, recommend that the Court grant the Town's motion for summary judgment.

FACTS

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this District's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure). Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved in favor of the non-movant. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

The plaintiff, Candice E. Testa, was the Town of Madison's Treasurer and Town Clerk between July 1997 and September 2002. (Def.'s Statement of Material Facts, ¶ 1, Docket No. 22.) Testa attained the position in 1997 by dint of public election. (Id. ¶¶ 3, 84.) However, at a 1998 town meeting, the citizens of Madison voted to make the combined position of Treasurer/Clerk an appointed position. (Id. ¶¶ 4, 85.) Appointments or reappointments to the position are considered on an annual basis, with a term of appointment running from July 1 through June 30. (Id. ¶¶ 5, 85.)

Pursuant to Madison's personnel policy, any discipline of Testa in relation to her job performance, including termination, was required to be based on "just cause." (Id. ¶ 10.) The parties agree that basic discipline could be meted out upon Testa by her supervisor, the Town Manager. However, they also agree that termination or non-reappointment could only be imposed by the Madison Board of Selectmen. (Id. ¶ 8; Pl.'s Opposing Statement ¶ 8, Docket No. 38.) The disciplinary procedure provides that the supervisor imposing the discipline should first determine that the employee is aware, or reasonably should have been aware, that the activity in question violated a rule, standard or policy. (Id. ¶ 9.) Discipline is supposed to be imposed in a progressive fashion, although the Town Manager is authorized to "skip steps" under appropriate circumstances. (Id. ¶ 11.) There is no dispute that interfering with another employee's job performance or engaging in other inappropriate, improper or unprofessional conduct might justify termination under appropriate circumstances. (Id. ¶ 12.)

From March 2000 through the present, Norman Dean has served as Madison's Town Manager. (Id. ¶ 1.) On July 19, 2002, Dean presented Testa with a letter in which he purported to terminate her employment with the Town. (Id. ¶ 89.) Testa filed a grievance and, following a hearing in August 2002, the Board of Selectmen determined that the Town Manager did not have

the authority to terminate Testa and voted unanimously to reinstate Testa, with back pay and benefits, but placed her on administrative leave with full pay and benefits pending a future Board hearing concerning her continued employment with the Town.  (Id. ¶¶ 90-92.)  That hearing was conducted on September 18 and 19, 2002.  (Id.. ¶ 93.)  Testa was represented by counsel at the hearing, testified on her own behalf and the Board conducted both the hearing and its deliberations in open session.  (Id. ¶¶ 94-96.)  Testa was allowed to present any evidence that she wished at the reappointment hearing, and no evidence or witness that she offered was rejected.  (Id. ¶ 100.)  At the hearing Town Manager Dean and three current employees, Triss Smith (Book Keeper), Nancy Gove (Tax Collector/Deputy Clerk), and Carmen Wilkinson (the Town Manager's Secretary) all testified concerning difficulties they had with Testa and testified that they would be unable to continue to work for the Town if Testa were reappointed, based upon her behavior and treatment of them and others in the office.  (Id. ¶¶ 1, 103-104.)

At the conclusion of the hearing there was a motion made and seconded to reappoint Testa to the positions of Town Clerk/Treasurer.  The motion failed by a vote of two in favor and three against.  (Id. ¶ 109.)  There was a motion made and seconded not to reappoint Testa.  That motion passed by a vote of three in favor and two against.  (Id. ¶ 110.)  The majority of the Board made the following written findings:

1.    The position of Town Clerk-Treasurer requires, among other essential functions, the establishment and maintenance of effective working relationships with other town officials, employees and the general public.  . . . .

2.    Ms. Testa's actions and demeanor have demonstrated a lack of respect and cooperation with her fellow employees and toward her supervisor the Town Manager.

3.    The testimony of the Town Manager and Town office employees was consistent and credible.  The testimony supported that there has been

continuing tension and discord in the town office over a period of over two years.

4. Although services to the public do not seem to have been significantly impaired yet, Ms. Testa's lack of respect and unwillingness or inability to work cooperatively have been disruptive to the town office. There are numerous examples in the record of the tensions created when Ms. Testa was accusatory (e.g., claiming that her mail was confiscated), demeaning (belittling the job duties of the secretary, telling the assistant clerk abruptly and rudely that she would not be re-appointed, telling other employees to "mind their own business" about work-related issues) and sarcastic (remarks to the Town Manager, in front of other employees, that [implied] that he did not take care of business and was incompetent). The poor working relationship has made it harder to share and delegate tasks and has affected morale. Other employees testified uniformly that they did not experience such tensions and hostility from anyone else except Ms. Testa.

According to the majority of the Board, they found, based on these findings:

[T]hat Ms. Testa has not demonstrated the ability to maintain effective working relationships with other town officials or fellow employees and that this has had an adverse effect on the Town office. The Board believes that it need not find "cause" to decide not to re-appoint Ms. Testa, since she serves on the basis of an annual appointment made by the Board (as Ms. Testa herself has asserted) commencing on July 1 of each year and since she has not been re-appointed to a 2002-2003 term by the Board. However, even if Ms. Testa has a reasonable expectation of being re-appointed, so that cause is required for her removal, the majority believes and decides that there is cause to remove her or to decline to renew her appointment.

Date: 10-4-2002

/s    George Elias, Chairman
/s    Ronald Moody
/s    Leo J. Demchak

*Dissenting*:
/s    Alice Ouellette
/s    Lee Longe

(Id. ¶¶ 111-112, incorporating Board of Selectmen Decision, Docket No. 22, Elec. Attach. 11.)

Contrary to the assertions set forth in the Board of Selectmen's decision, Testa maintains that the

Board terminated her employment in retaliation for her outspokenness on matters of public

4

concern, including what she contends were some acts performed in violation of law, rule or policy.  The material evidence concerning these allegations follows.

Between May and August of 2001, Testa contacted the Board of Selectmen and the Town Manager with various oral and written complaints concerning office matters.  (Def.'s Statement ¶¶ 39, 41, 43, 47-48, 50-51, 53.)  In particular, she complained that the bookkeeper was not providing her certain information, known as a "trial balance" (Id. ¶ 39); that she was not receiving payroll deduction reports from the bookkeeper (Id. ¶ 41);  and that she was not receiving state revenue checks and that they were being given to the Deputy Treasurer instead (Id. ¶ 43).

On August 19, 2001, Testa sent a seven-page letter to the Town Manager and the Board of Selectmen making various complaints.  (Pl.'s Add'l Statement ¶ 117, Docket No. 38.)  That letter is in the record.  (Docket No. 22, Elec. Attach. 5.)  In the letter, Testa referred to a prior act of embezzlement that occurred in the town office and complained about the absence of appropriate "checks and balances" being in place to prevent it from occurring again.  (Id. ¶¶ 117-118.)  Some of Testa's office-related comments and complaints were as follows: that she was not being given a balance statement or history of account expenditures (Id. ¶ 47); that a system of checks and balances established by a former Town Manager had been abandoned (Id. ¶ 48); that job descriptions needed to be followed (Id. ¶ 50); that accounts needed to be balanced daily (Id. ¶ 51); that employees should not leave money out in the open (Id. ¶ 53).  Additionally, Testa queried of the Board members:

"Do you have an accurate knowledge of the state of the town accounts?";

"Are you aware that the system of checks and balances set up by former Town Manager Bill Frye was abandoned by his successor and this directly led to the embezzlement that took place here?";

5

"Do you realize that this could have been avoided if you had listened to me?";

"Is your head in the sand or were you all involved with this plot to get rid of me?"

Testa then set about in the letter to explain "what needs to be done to get this office back on the right track." Among other advice, Testa told them to fill the vacant office clerk position "so that people can do their jobs efficiently," describing the failure of the Board to fill the position as harassment toward her and the tax collector. Additionally, Testa advised that the Board put in place various procedures to ensure that town accounts and expenditures would be balanced daily and monitored on a regular basis. Yet other advice was that Board members attend class "so that you use knowledge in the decisions you make, not fly by the seat of your pants"; that they not listen to the Town Manager's secretary in matters related to Testa's job because the secretary "doesn't have an idea of what my job is about" and "has no idea of what is necessary for my position"; that they "be honest," "stick to [their] code of ethics," "use common sense," and "maintain an open mind." In her closing paragraph, Testa posed a number of questions, such as why Board members would not talk to her about her concerns and whether it was "worth it to try to get rid of me." (Pl.'s Statement ¶¶ 55, 57; 8/19/2001 Letter, Docket No. 22, Elec. Attach. 5.) Testa explains in her summary judgment papers that, for months prior to the August 19, 2001, letter, Testa had made reports to the Town Manager and the Board that the office checks and balances system was inadequate and that office practices and procedures were not being corrected to detect and prevent future embezzlement. (Add'l Statement ¶ 119.) Presumably to explain the rude tone of her letter, Testa asserts that she had "personal friendships with the Selectmen" and that these relationships were "mutually frank and candid." (Id. ¶ 120.) In addition, she observes, and the Town admits, that following receipt of the August 19, 2001, letter, neither the Town Manager nor the Board of Selectmen notified Testa that the August 19,

2001, letter was interpreted as "insubordinate, commanding, demanding, rude or disrespectful." (<u>Id.</u> ¶ 121.)  In fact, Testa received no response at all.  (<u>Id.</u> ¶ 122.)

Testa asserts that, "a couple of months later," she opposed the Town's decision to invest $100,000 of the Town's money for management with Northeast Management, a business owned or run by Town Manager Dean's son, because the contract had not been competitively bid.  (<u>Id.</u> ¶ 123.)  However, her deposition testimony and documents in the record reflect that the money was invested with Northeast Management after a bidding process and that one other business also bid for the contract.  (Def.'s Reply Statement ¶ 123, Docket No. 44.)

Sometime during the winter/spring of 2002, a proposal was made to reorganize the Madison Town Office and increase office wages, which proposal, according to Testa, was favored by her office co-workers and the Town Manager.  (<u>Id.</u> ¶¶ 146-147.)  The Board of Selectmen asked Nancy Gove to do some research to determine what wage rates town employees were being paid in similar towns for positions that were comparable with the positions in the town of Madison.  (<u>Id.</u> ¶ 36.)  There were meetings and discussions between the town employees regarding possible wage restructuring.  (<u>Id.</u> ¶¶ 37, 73.)  Additionally, the Town Manager proposed that some job responsibilities be reallocated within the office.  (<u>Id.</u> ¶ 72.)  Under the proposed reorganization, the tax collector position would be merged with the treasurer position, so that the individual in that position, Nancy Gove, would have both titles and Testa would come to fill only her town clerk position.  (Pl.'s Add'l Statement ¶ 148.)  Testa opposed the proposal whereas her co-workers supported it.  (<u>Id.</u> ¶ 150.)  Testa was forthright in her opposition; she testified against the proposal at a Board of Selectmen meeting on April 2, 2002.  (Def.'s Statement ¶ 74.)  According to Testa, she felt that the proposed changes would, in effect, terminate her from her treasurer position without cause and that combining the tax collector and

treasurer positions would mean that one person would have too much control over town money and accounts and there would be a risk of future embezzlement.  (Id. ¶ 151.)  According to Testa, after she voiced her opposition to the proposal, her co-workers became "visibly hostile" toward her, would make "snide and rude comments" to her and would obstruct her efforts to perform "her mandated treasurer duties."  (Id. ¶¶ 152-153.)  Testa asserts that Triss Smith, Carmen Wilkinson and Nancy Gove all made "snappy, rude and disrespectful" comments to her, that she complained to Town Manager Dean, and that Dean failed to take any action to investigate, warn or discipline any of these women.  (Id. ¶¶ 156-161.)

On April 9, 2002, and April 22, 2002, before the Board officially acted on the proposal (in May 2002 they voted to place it on the ballot for the June 2002 primary election), Testa sent to Town Manager Dean and the Board of Selectmen, respectively, what she characterized as "grievances."  In these letters Testa complained that, in her view, the proposed reorganization of the town office was designed to demote her, without cause.  (Id. ¶ 76.)

On May 15, 2002, Testa made written complaints to Town Manager Dean in a document listing "Treasurer's concerns."  That document is also in the record.  (Docket No. 22, Elec. Attach. 7.)  In it, Testa complains of numerous internal, office management matters.  (Def.'s Statement ¶ 23.)  In her statement of additional facts, she describes these complaints, in conclusory fashion, as concerning harassment by co-employees and withholding information required for her to perform her "state mandated duties."  (Pl.'s Add'l Statement ¶ 125.)  For example, one complaint concerned the fact that Town Manager Dean was signing checks even though Testa was present in the office to sign them.  (Def.'s Statement ¶ 63.)  At his deposition, Dean testified that he did not like the tone of the letter, indicating: "It was like I didn't have the authority to question her or to ask her to do things.  It was like she wanted to be the one that was

telling me what to do."  (Def.'s Statement ¶ 23, citing Dean Depo at 110, Docket No. 22, Elec. Attach. 17.)  The Town offers a shorthand characterization in its statement of facts, describing the letter as "rude."  It is extraordinarily difficult not to credit that characterization.

Also in May, the Board of Selectmen placed the wage increase and reorganization proposal on the ballot for a June 2002 town election.  (Id. ¶ 154.)  The proposed wage increase was turned down by the citizens of Madison at the ballot, effectively nixing the planned reorganization.  (Id. ¶ 77.)  However, Testa asserts that, despite the loss at the ballot, Town Manager Dean "continued to take the 'reorganization' position toward [her] and . . . many of [her] job responsibilities were being taken away, and her ability to do her job was being undermined." (Pl.'s Opposing Statement ¶ 78.)  According to Testa, she reported to Dean and the Board that following her opposition to the wage increases and reorganization, Gove stopped giving Testa tax lien reports and other financial information.  (Id. ¶ 179.)  Testa reported to the Board of Selectmen and Town Manager that a combination of events cumulatively prevented her from effectively and efficiently performing her statutorily mandated duties and responsibilities as Town Treasurer.  (Id. ¶ 180.)  According to Testa, following her opposition to the proposed reorganization of the office, Dean started signing Town checks even when Testa was in the office, and did not apprise her of the expenditures even though they would eventually fall under her accounting responsibility.  (Id. ¶ 181.)  Previously, it was the practice that Testa would sign town checks whenever she was working.  (Id. ¶ 182.)

In June 2002, the Town Manager allowed two of the four office workers to be scheduled out of the office at trainings on Election Day.  (Id. ¶ 127.)  Testa complained to the Town Manager and asked that he reconsider that decision, or bring in temporary staff to help out.  (Id. ¶ 128.)  Testa attests that the Town Manager was rude in his response, and disregarded her protest

"that she was statutorily obligated to run the election."  (Id. ¶ 130.)  Testa also avers, in

conclusory fashion, that she "was personally responsible, by statute, to run town elections."  (Id.

¶ 126.)  Thus, she maintains, it was not in her or the Town's best interests to leave the election or

the Town office understaffed.  (Id.)  Testa also complains that the Town Manager's secretary

made rude remarks to her on one or more occasions in the Town Manager's presence and that the

Town Manager failed to reprimand his secretary.  (Id. ¶¶ 131-132.)  Thereafter, on June 5, 2002,

Testa sent a written complaint and grievance to the Town Manager alleging that the Town

Manager and other office employees were creating a hostile environment and interfering with her

ability to do her job.  (Id.  ¶¶ 25, 133; see also Letter, Docket No. 22, Elec. Attach. 8.)  A second

"grievance" letter followed on the same day.  (Def.'s Statement ¶ 26; Letter, Docket No. 22, Elec.

Attach. 9.)  The Town Manager did not speak with, investigate, warn or discipline the other

office employees regarding Testa's June 5, 2002, complaint and, according to Testa, told her that

she was being "petty" over mere "office bickering."  (Def.'s Statement ¶¶ 134-136.)  Testa

additionally asserts that the Board of Selectmen never heard her grievances.  (Id. ¶ 134.)

According to the Town, that is because there was not sufficient time "before the incident with

Gove occurred."  (Def.'s Reply Statement ¶ 134.)  Among the issues grieved by Testa:  that the

Town Manager gave the bookkeeper the authority to call Bangor Savings Bank (Def.'s Statement

¶ 58); that the Town Manager had increased the "target balance" without telling her or giving her

a reason for doing so (Id. ¶ 60); and that other people within the office were opening mail that

was addressed to her in her capacity as Town Clerk/Treasurer (Id. ¶ 62).

　　　　On or about June 19, 2002, the Town Manager sent a letter to Testa stating, among other

things:

. . . . As Town Manager I also have the option of changing the target balance at the bank.  As far as opening mail, any mail that comes into this office is Town mail and may be opened by this office.

On Election Day it was unfortunate that the state scheduled a necessary training session at the same time as the primary election.  It was, and is my opinion that the class was or would be beneficial to the tax collector and bookkeeper as well as the town.

I can and will request that all personnel work together in a harmonious work environment, but I cannot require friendship.  I have heard no evidence of harassment[,] only petty complaints and interoffice bickering.

. . . . Every complaint that you have is not necessarily a grievance.

(Def.'s Statement ¶ 27; see also Letter, Docket No. 22, Elec. Attach. 10.)  Later that month, Testa took medical leave on account of her stress at what she describes as the "hostility she faced at work."  (Id. ¶ 137.)

In July of 2002, there was an argument between Testa and Gove regarding Testa's attendance to matters related to the Town's "annual dog warrant."  (Id. ¶¶ 162-165.)  In short, according to Testa, she was reasonable and right and Gove was rude and wrong.  (Id. ¶¶ 165-173.)  Testa cites both her own affidavit and the deposition testimony of Nancy Gove in support of these statements.  It is uncontested that Gove asked Dean if she could have the afternoon off as a result of the exchange and that Gove was permitted to leave.  (Pl.'s Statement ¶ 162.) No other office workers were present for or party to the argument. (Id. ¶ 174.)  However, after speaking with Gove on her way out of the building, Smith and Wilkinson essentially staged a walkout and remained in the basement break room for over an hour, leaving Testa alone to run the office during that time.  (Id. ¶¶ 175-176.)  Following this incident, Town Manager Dean summarily terminated Testa's employment without asking Testa her side of the story or giving her a chance to explain.  (Id. ¶ 196.)  Testa grieved her termination to the Board of Selectmen, who reinstated her, but placed her on administrative leave pending a disciplinary hearing.  Testa

11

never actually returned to work (Id. ¶ 197) and her employment with the Town was terminated by the Board following a hearing, as recounted near the beginning of this section.

Testa asserts that she was denied due process because one of the members of the Board of Selectmen was biased against her. She asserts that, prior to the completion of the Board's hearing, Selectman George Elias made the statement to the effect that, "I already know what the outcome is going to be." This statement was allegedly made by Selectman Elias, following the first day of the hearing, in conversation with one Philip Morey, a resident of Madison, whose affidavit Testa has secured in support of her opposition to summary judgment. (Id. ¶ 201; Morey Aff., Docket No. 38, Elec. Attach. 16.) Testa additionally asserts that, prior to July 19, 2002, not one of her co-workers who testified against her at the hearing had made any complaints about her to "the Town" and, further, that no other complaints or discipline were documented in her personnel file other than a single letter entered in her file in 2000. (Id. ¶¶ 198-200.)

Testa's counsel wrote a letter to the Board on September 13, 2002, expressing Testa's position that the actions of the Town Manager and Board of Selectmen constituted retaliation for whistleblower activity and first amendment activity. (Id. ¶ 205; Def.'s Reply Statement ¶ 205.)

The decision of the majority of the Board of Selectmen has been set forth above. It appears from the record that there was evidence introduced at the hearing capable of supporting each of the majority's findings.

### DISCUSSION

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container,

Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to

judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the

governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  In reviewing the record for a genuine issue of material fact, the Court must view the

summary judgment facts in the light most favorable to the nonmoving party and credit all

favorable inferences that might reasonably be drawn from the facts without resort to speculation.

Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts

and inferences could support a favorable verdict for the nonmoving party, then there is a trial-

worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of

Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

    Testa asserts the following four causes of action in her complaint:

    1.    A Maine statutory whistleblower claim, brought pursuant to Maine's
          Whistleblower's Protection Act, 26 M.R.S.A. §§ 831-840;

    2.    A state common law defamation claim;

    3.    A wrongful termination/deprivation of property claim; and

    4.    A constitutional, "First Amendment" claim, brought pursuant to 42 U.S.C.
          § 1983.

As the caption suggests, the Town of Madison is the sole defendant.  The Town's motion for

summary judgment challenges all four causes of action.  I address each cause in turn.

13

A.      **Whistleblower Protection**

The Town argues that Testa fails to present a genuine whistleblower case because her many complaints to the Town Manager and the Board of Selectmen concerned inter-office matters that a reasonable person would not believe amounted to unlawful acts by other municipal officials or officers.  (Mot. Summ. J. at 11-13, Docket No. 20.)  Additionally, the Town contends that Testa fails to adduce evidence capable of supporting a finding that her complaints were the cause of her termination.  (Id. at 13- 15.)  Finally, the Town asserts as a legitimate, non-retaliatory justification for Testa termination that it found Testa unable to work cooperatively with her fellow town officials and employees.  (Id. at 15-16.)

Testa's claim arises under section 4572(1)(A) of the Maine Human Rights Act (MHRA), codified at 5 M.R.S.A. §§ 4551-4634, which provides both public and private employees with a cause of action to redress workplace retaliation for an employee's exercise of rights afforded under the Maine Whistleblower Protection Act (MWPA), codified at 26 M.R.S.A. §§ 831-840. The MWPA, in turn, protects an employee from discrimination or retaliation when she has complained in good faith to the employer or a "public body" about a workplace condition or activity that she reasonably believes is "a violation of law or rule adopted under the laws of this State, a political subdivision of this State or the United States," among other things.  26 M.R.S.A. § 833(1)(A).  Neither the MHRA nor the MWPA has a requirement that the matter reported or complained of must actually be unlawful. Instead, an employee must have a reasonable belief that the employer's conduct fell into a protected category and must communicate his or her belief to the employer in good faith.  Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999).

Because there is no direct evidence in this case that the Board of Selectmen harbored retaliatory animus toward Testa when it terminated her employment, summary judgment analysis of Testa's whistleblower claim must follow the familiar, burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Smith v. Heritage Salmon, 180 F. Supp. 2d 208, 216 (D. Me. 2002). Accordingly, the first order of business is for Testa to establish that she can meet the elements of a *prima facie* case. "Under the MWPA, a plaintiff states a prima facie case if he shows (1) that she engaged in an activity protected under the Act; (2) that she suffered adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse action." Id. Should Testa succeed in this endeavor, a presumption of retaliation arises and "the evidentiary burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for taking the adverse action against the plaintiff." Id.; see also Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000). Thereafter, the Town will need to put forward a legitimate, non-retaliatory rationale in order to answer Testa's initial volley and require Testa to demonstrate that the Town's non-retaliatory rationale is but a pretext for retaliation. Dominguez-Cruz, 202 F.3d at 430 n.5. If Testa can generate a genuine issue of material fact as to the legitimacy of the Town's non-retaliatory rationale, then summary judgment will be denied. Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003). To generate a genuine issue, her presentation must be sufficient to "enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 n.5 (1st Cir. 1999); see also Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R., 404 F.3d 42, 48 (1st Cir. 2005) (affirming entry of summary judgment in favor of employer where "the dozen perceived chinks

in [employer's] reasons for terminating plaintiff let in no light as to any true reason [and did] not add up to the slightest suggestion of an effort to deceive or cover up a hidden motive").

Testa argues that the following conduct that she "reported" was reasonably viewed by her to violate state law and municipal ordinances, warrants and rules:

> a.    Her complaints about the proposal to combine the treasurer position with the bookkeeper position, including her oral statements at a town meeting and her written "grievance" that such a reorganization would amount to a demotion for her, without cause or due process;
>
> b.    Her written complaint dated August 19, 2001, and her May 15, 2002, letter regarding "treasurer's concerns," both of which she describes as concerning interference she was getting in regard to her performance of her "state mandated responsibilities," such as withholding financial information from her, citing 30-A M.R.S.A. §§ 5603, 5604, 5821;
>
> c.    Her complaint that she was not receiving all information related to payroll warrants because the bookkeeper (also deputy clerk) was usurping those tasks, citing 30-A M.R.S.A. § 5603;
>
> d.    Her opposition to investing municipal funds with Northeast Planning, which she maintains was not put out to bid, in violation of municipal investment policy devolving from 30-A M.R.S.A. § 5706;
>
> e.    Her complaint that the Town Manager lacked the authority to terminate her employment, and her complaint that he did so without complying with due process precepts, citing 30-A M.R.S.A. § 2601.

(Pl.'s Obj. at 5-10.)  I address these assertions *seriatim*.

**1.    The reorganization proposal**

I agree with the Town that a reasonable person standing in Testa's shoes would not consider the proposal to reorganize the town clerk, bookkeeper and treasurer positions and functions to be unlawful.  Testa fails to identify any statute, policy or rule prohibiting municipal officers and officials from proposing a restructuring of a municipal office.  Indeed the tenor of her concerns expresses her dissatisfaction with personal impact the reorganization would have upon her, not her concern about violation of rules or laws.

**2.      Treasurer's duties**

Under the treasurer's duties heading, Testa characterizes her "primary concern" as a complaint that her fellow office workers (particularly the bookkeeper and tax collector) were "withholding certain financial information from her that was necessary for her to faithfully fulfill her legal obligations as Town Treasurer."  (Pl.'s Obj. at 7.)  Consideration of this aspect of Testa's claim requires the Court to review Testa's August 19, 2001, May 15, 2002, and June 5, 2002, missives.  My opinion of the August 19, 2001, letter is that it is a broad complaint about generalized mismanagement and neglect that might create a fertile setting for a crooked town official to embezzle money, assuming that a thief was then employed by the Town, something Testa does not allege.  There is no contention that anyone was presently embezzling money or committing any other crime.  Nor does Testa assert that the interference or non-cooperation from the bookkeeper and tax collector actually prevented any of her duties from being accomplished.  By way of example, one of the questions Testa posed in her August 19 letter could be construed as a report that a "system of checks and balances set up by former Town Manager Bill Frye was abandoned by his successor."  Conceivably, this complaint concerned the statutory duty imposed on every municipality to "[k]eep its accounting records in conformity with generally accepted principles of municipal accounting," 30-A M.R.S.A. § 5821, but Testa provides no evidence of what was wrong with the way the Town was keeping its "accounting records" or how the Town's practice deviated from "generally accepted principles of municipal accounting."  She would simply have the factfinder take her word for it.  As Testa asserts, she need not necessarily provide her employer with chapter and verse of every statutory section or rule she believed was being violated, but we are now at the summary judgment stage of litigation and Testa has not presented the kind of evidence from which the factfinder could draw a conclusion that it was

17

reasonable for Testa to believe that unlawful activity was taking place within the Madison Town Office, as opposed to activity that she felt was ill-advised or below her exacting personal standards.

As for Testa's May 15, 2002, list of treasurer's concerns, those that arguably concern Testa's ability to perform her state mandated duties do not concern what any reasonable person would consider unlawful activity as opposed to, shall we say, interoffice bickering.  I have in mind here Testa's complaints about short staffing, the town manager signing checks, the opening of her mail, the tax collector making an alleged mistake about the classification of a boat on the cash receipts summary, the tax collector allegedly changing information on the computer, the tax collector and the secretary failing to follow Testa's instructions about how to handle certified copies, the tax collector "questioning my authority" and "throwing my cash draw[er] off by $20.00," the bookkeeper directing her to the town manager to obtain information she wants, her pondering "when will the bookkeeper issue a trial balance," and the tax collector refusing to share her computer so that it takes Testa more time to run a report.  As to all of these concerns about her performance of her job, Testa's claim is merely that she was not receiving what she considered to be the level of deference and cooperation she deserved, not that she was actually prevented from performing any of her tasks so as reasonably to believe that she was exposed to legal liability for malfeasance.

Finally, there is Testa's June 5, 2002, grievance.  The only concerns raised therein about her performance of state mandated duties are her plaints about short staffing and the "interception and opening of mail" addressed to Testa in her capacity as the Town Clerk/Treasurer by other office employees.  Testa does not even pretend in her memorandum of law that either topic could seriously be regarded as relating to unlawful activity.

18

### 3.    Payroll warrants

Maine law requires that a municipal treasurer shall "disburse money only on the authority of a warrant drawn for the purpose, affirmatively voted and signed by a majority of the municipal officers." 30-A M.R.S.A. § 5603(2)(A)(1).  In her memorandum of law, Testa cites the foregoing provision of law and argues that her whistleblower claim is supported by her complaint "that all of the warrants and deduction reports for payments [of payroll] were prepared by the Bookkeeper and given directly to the Town Manager, who provided them to the Board of Selectmen for approval."  (Pl.'s Obj. at 8.)  She maintains that because she "did not see the warrants until after they were signed, along with the checks prepared by the Bookkeeper," it was reasonable for her to believe that unlawful activity was transpiring.  Testa's reliance on this statutory provision does not aid her because the provision only restricts a treasurer's authority to disburse money, it does not mandate that a treasurer prepare all warrants or draft all checks for payment on warrants duly executed by the municipal officers.  Nor does it mandate that a treasurer play a roll in determining when or whether to disburse the municipal payroll.  Finally, Testa has not presented any evidence to support a finding that she reasonably believed that Town Manager Dean and the Bookkeeper were engaged in any chicanery with regard to the municipal payroll.  It is apparent that she saw both the warrants and the checks and there is no suggestion that she was unable to review the underlying payroll records.  As with the accounting matters discussed above, Testa merely disapproved of the changes that Dean was making with respect to internal office procedures.  She has not presented the kind of evidence from which the factfinder could conclude that it was reasonable for her to believe that it was unlawful for someone else to prepare warrants and checks or for a warrant to be presented to the Board of Selectmen without her prior approval.

### 4.     Investment of municipal funds

Testa's assertion that the Town unlawfully awarded an investment account without putting it out to bid is contradicted by the record.  To the extent that the record might support a finding that Testa informed Town Manager Dean, before any bids were solicited, that the account had to be competitively bid because it was in excess of $10,000, the provision of such information is not a report of unlawful activity.

### 5.     Illegal termination

It appears from the record that the Town Manager engaged in an unlawful act when he purported to summarily terminate Testa's employment without affording her any notice of the grounds for his decision or an opportunity to be heard on the matter.  Testa might reasonably have believed that her grievance of this act, submitted to the Board of Selectmen, constituted a report of unlawful activity.  Thus, Testa's final grievance could, in theory, support a finding that Testa engaged in a protected activity, the first element of her *prima facie* case.  However, the Board of Selectmen in short order negated the termination and reinstated Testa with full pay and benefits, albeit subject to a suspension of her duties pending their due process review.  The Town argues that this was not an adverse employment action because a suspension with pay does not violate the due process clause.  (Def.'s Reply at 9.)  The test, of course, is whether the suspension and the ensuing termination were adverse employment actions, not whether the Fourteenth Amendment was violated.  Clearly, the termination was an adverse employment action, even though suspension with pay pending an administrative investigation, or "administrative leave," is generally regarded not to be an adverse employment action.  See Singletary v. Mo. Dep't of Corr., ___ F.3d ___, ___, 2005 U.S. App. LEXIS 19761, *11 (8th Cir. Sept. 14, 2005) (collecting opinions of the Fourth, Fifth and Sixth Circuits and agreeing with their holdings that paid

administrative leave pending investigation is not itself an adverse employment action).

Nevertheless, there are two significant stumbling blocks for Testa's due process grievance *qua*

whistleblower claim:  (1) her administrative grievance of her termination was not really "whistle-

blowing" because the grievance was the very procedural mechanism designed to cure the due

process violation and the grievance process did, in fact, afford Testa with all the pre-termination

process she was due from the Town, as discussed below; and (2) even if her grievance could be

construed as a whistle-blower report, the grievance cannot logically be construed as the cause of

her termination because the Town Manger had already imposed a termination, albeit unlawfully,

and the grievance process resulted in Testa's reinstatement and afforded Testa with over two

months of paid administrative leave.  Cf. 26 M.R.S.A. § 833(2) (indicating that the anti-

retaliation protection afforded by the WPA "does not apply to an employee who has reported . . .

a violation . . . unless the employee has first brought the alleged violation, condition or practice

to the attention of a person having supervisory authority with the employer and has allowed the

employer a reasonable opportunity to correct that violation").  A contrary rule would essentially

mean that every unsuccessful grievance of an adverse employment action would give rise to a

prima facie whistleblower claim.

### 6.   Conclusion

For the reasons stated above, I recommend that the Court grant summary judgment in

favor of the Town on count I.

## B.   Defamation

The Town argues that the existing record cannot support Testa's defamation claim.  Testa

fails to oppose this aspect of the motion in her opposition memorandum.  Accordingly, Testa has

abandoned her defamation claim and judgment should enter in favor of the Town on count II.

**C.**     **Deprivation of Property/wrongful termination**

The Town argues that Testa's wrongful termination claim cannot succeed because she had no reasonable expectation of continued employment and, in any event, was denied reappointment for cause following a due process hearing.  (Mot. Summ. J. at 20-22.)  In response, Testa argues that she had a reasonable expectation in continued employment that entitled her to full due process protection, that the Town did not establish just cause to terminate her and that the hearing conducted by the Board of Selectmen did not comply with due process because the result was predetermined on account of the chairman's bias against her.  (Pl.'s Obj. at 15-21.)  A basic prerequisite to Testa's claim is that she had a legally cognizable interest in continued employment with the Town.  If she did not, then the circumstances of this case could not give rise to a constitutional claim premised on the Due Process Clause.  Krennerich v. Inhabitants of Bristol, 943 F. Supp. 1345, 1352 (D. Me. 1996).  To determine whether public employees possess a property right in their employment, the court must "examine the local law and the terms and conditions of the employment arrangement. "  Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005).  In Maine a property interest in continued employment may be established by contract, statute, or by proof of an objectively reasonable expectation of continued employment."  Id. (citing Mercier v. Town of Fairfield, 628 A.2d 1053, 1055 (Me. 1993)).  Although the parties are in agreement that Madison's personnel policy ordinarily would have protected Testa from termination without "just cause" during her term of office (Def.'s Statement ¶ 10), the Town contends that reappointment to a one-year term of office could be denied without cause.  (Mot. Summ. J. at 20.)  The Town asserts that Testa was never formally appointed by the Board of Selectmen to the annual term that started July 1, 2002.  (Def.'s Statement ¶ 6.)  Testa opposes this statement of fact with an assertion that she was

22

reappointed for the 2002-2003 term by Town Manager Dean and sworn into office by Perley Beane, Madison's Community Development Director.  She supports this statement with her own affidavit, with a copy of an Oath of Office form that she executed and that was subscribed and sworn to by Ms. Beane on July 17, 2002, and with deposition testimony by Nancy Gove to the effect that appointment papers were completed for Testa for the 2002-2003 term, although possibly by Town Manager Dean rather than by the Board of Selectmen.  (Pl.'s Opposing Statement ¶ 6.)  Additionally, Testa points out that she continued to work beyond the end date of her 2001-2002 appointment and that the Board of Selectmen were aware of that fact.  (Id.)

The Town of Madison subscribes to the "town manager plan" of municipal governance. See 30-A M.R.S.A. § 2631.  Section 2636(6) of Maine Revised Statutes Title 30-A provides that a town manager shall appoint town officials, unless otherwise provided by town ordinance.  The Town Manager also has authority to remove appointments "for cause, after notice and hearing." Id. § 2636(14).  Based on my review of the existing record, I cannot conclude that Testa did not have a reasonable expectation of continued employment with the Town, because Town Manager Dean completed her appointment papers and she was administered the oath of office before Dean purported to terminate her employment on July 19, 2002.

Proceeding from the premise that Testa had an objectively reasonable expectation of continued employment for the 2002-2003 term and that she would not be terminated during that term without cause, the Court must next consider whether Testa's discharge from employment was supported by adequate procedural protections.  The record reflects that Town Manager Dean summarily terminated Testa's employment without affording any process to her.  Doing so was contrary to the statutory requirement that he first afford Testa with notice and a hearing.  However, in due course the Board of Selectmen afforded Testa with notice of the issues that

were deemed by Town Manager Dean to warrant her termination and also afforded Testa leave

to have counsel represent her and to be heard in the context of a full adversarial hearing at which

she was able to testify on her own behalf, cross-examine the witnesses against her and introduce

documentary exhibits.  In the meantime, the Board ensured that Testa received full compensation

and benefits pending the hearing.  With regard to whether that process satisfied due process

under either the United States Constitution or the Maine Constitution, Testa complains only that

she was denied a fair and impartial tribunal.  The only evidence in the record that is germane to

this contention is the Morey affidavit, in which it is asserted that Selectman Elias stated he knew

what the outcome of the hearing would be before the hearing was completed.  That evidence is

insufficient to support the due process component of Testa's "wrongful termination/deprivation

of property" claim.

     The right to an unbiased "tribunal" has often been described as a fundamental

requirement of due process.  See, e.g., Beauchamp v. De Abadia, 779 F.2d 773, 776 (1st Cir.

1985) ("An impartial decisionmaker is, of course, a fundamental component of due process.").

However, a distinction has been drawn by the courts when the tribunal in question is presiding

over a pre-termination hearing, as opposed to a post-termination proceeding.  Although a state

must afford a "tenured" public employee with a meaningful post-termination hearing before a

fair and impartial tribunal, it need not do so at the pre-termination stage.

> Before a tenured public employee is discharged, she is entitled to oral or written
> notice of the charges against her, an explanation of the employer's evidence,
> and an opportunity to present her side of the story.  This procedure complies with
> the essential requirements of due process: notice and an opportunity to respond.
> Contrary to the district court's premise, it is not required that a hearing be
> conducted before an impartial decisionmaker.

Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12 (1st Cir. 1989) (internal citation and

quotation marks omitted) (paraphrasing Cleveland Bd. of Education v. Loudermill, 470 U.S. 532,

546 (1985)); see also Locurto v. Safir, 264 F.3d 154, --- (2d Cir. 2001) ("No . . . decisions from

our Circuit or other circuits have held that [] a neutral adjudicator is a necessary component of

due process at a pre-termination hearing.  We hold that it is not."); McDaniels v. Flick, 59 F.3d

446, 459-60 (3d Cir. 1995) (same); Walker v. Berkeley, 951 F.2d 182, 183-84 (9th Cir. 1991)

(same); Duchesne v. Williams, 849 F.2d 1004, 1006 (6th Cir.) ("[T]he property interest created

in the normal government job covered by a civil service system, which creates a "just cause"

requirement for discharge, does not entitle the employee to an impartial judge at the

pretermination 'right-of-reply' hearing."), cert. denied, 489 U.S. 1081 (1989); Garraghty v.

Jordan, 830 F.2d 1295, 1302 (4th Cir. 1987) (same); Schaper v. City of Huntsville, 813 F.2d 709,

715 (5th Cir. 1987) (same).  Because the Board of Selectmen presided at Testa's pre-termination

hearing, and because Testa was afforded a full opportunity to present her side of the matter at the

hearing, the bias Testa alleges did not deprive her of procedural due process.[1]

**D.     First Amendment**

        In order to prevail on her § 1983 claim of retaliation for speech protected under the First

Amendment, Testa must demonstrate that her speech or conduct was constitutionally protected,

and that it was a substantial or motivating factor in the Town's decision to terminate her

employment.  Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004) (involving the right to petition

the government for redress) (citing Mount Healthy City Sch. Bd. of Educ. v. Doyle, 429 U.S.

274, 287 (1977)); see also Lewis v. City of Boston, 321 F.3d 207, 219-19 (1st Cir. 2003)

(addressing claim of retaliation for free speech activity).  If she can carry this burden, the Town

---

[1]     Testa does not contend in her complaint and has failed to argue in her memorandum of law that the post-deprivation procedures afforded to her under Maine law are constitutionally inadequate.  Indeed it would appear to me that she could have obtained judicial review of the Board of Selectmen's decision pursuant to Rule 80B of the Maine Rules of Civil Procedure.  There is nothing in Maine procedure or the United States Constitution that mandates a finding by a jury on the underlying issue of "just cause."  As I indicated in my statement of facts, there is in any event sufficient evidence in the record to support the Board's findings.

may avoid liability by meeting the so-called <u>Mount Healthy</u> defense, <u>i.e.</u>, by showing that "it would have reached the same decision . . . even in the absence of the protected conduct." <u>Id.</u> (quoting <u>Mount Healthy</u>, 429 U.S. at 287).

Testa claims that the Town retaliated against her for her many complaints and grievances about municipal mismanagement in regard to the general operation of the town office and the municipal treasury.  The Town allows in its principal summary judgment brief that "at least some of [Testa's] speech dealt with matters of public concern and [that Testa's] speech outweighed the [Town's] interest in the efficient performance of its public services."  (Mot. Summ. J. at 22.)  The Town contends, however, that it is entitled to summary judgment against this claim because Testa "cannot meet her burden of proving that her speech was a motivating factor in the decision not to reappoint her" and because Testa "would not have been reappointed because of her behavior problems."  (<u>Id.</u> at 22-23.)  According to the Town, the Board of Selectmen terminated Testa's employment because of her "inability to get along with her co-workers."  (<u>Id.</u> at 23.)  In addition, the Town supports the termination based on the Board of Selectmen's conclusion that Testa's grievances and letters were "rude and disrespectful."  (<u>Id.</u>)  It is well-established that, although "individuals are entitled to speak on matters of public concern free from the threat of retaliation," they may be disciplined or discharged lawfully based on the manner or method by which they engage in protected speech.  <u>Wagner v. City of Holyoke</u>, 404 F.3d 504, 508 (1st Cir. 2005).

The question of whether Testa engaged in protected speech is a question of law, whereas the issue of motivation presents a question of fact.  <u>Baron v. Suffolk County Sheriff's Dep't</u>, 402 F.3d 225, 233 (1st Cir. 2005).  Either way, it is Testa's burden to demonstrate that the evidence

she has adduced is sufficient to support the requisite findings.  Id.; see also Collins v. Nuzzo, 244 F.3d 246, 251-52 (1st Cir. 2001).

Testa contends that all of her "statements regarding investment of public monies, Town budgetary issues, checks and balances to prevent embezzlement of town monies, and reorganization effecting municipal officials are a[ll] matters of sufficient public concern to meet the constitutional threshold."  (Pl.'s Opp'n at 23.)  The Town does not challenge that broad-brush assertion in its reply, which takes us over the first hurdle.

On the factual issue of whether Testa's first amendment activity was a motivating factor in the Board of Selectmen's decision to terminate her employment, Testa need not present direct evidence of a retaliatory motive; she may rely on circumstantial evidence as is commonly done in other retaliation and discrimination claims.  Lewis, 321 F.3d at 219.  However, unlike the mine run of employment discrimination claims, if Testa succeeds in making this showing, the burden of *persuasion*, not merely a burden of production, shifts to the Town to prove that it would have made the same employment decision regardless of Testa's protected activity.  See Jirau-Bernal v. Agrait, 37 F.3d 1, 3-4 (1st Cir. 1994).  Thus, if Testa can make a showing capable on raising an inference of retaliation for protected activity, summary judgment would be warranted "only if [the Town's] evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the demotion."  Id.; see also Garvey v. Montgomery, 128 Fed. Appx. 453, 459 (6th Cir. 2005) (unpublished opinion) (wording the standard as affording summary judgment based on the Mount Healthy defense only when "no reasonable juror could fail to return a verdict for the defendant").

Testa relies in part on the temporal proximity between her termination and her free speech activity to establish her causation burden.  (Pl.'s Obj. at 23-24.)  She calculates the

proximity as, respectively, a "few months" and "two months."  (Id. at 23.)  As far as Testa's complaints about office management and "harassment" are concerned, the case for an inference of causation is undercut by the fact that Testa had thoroughly and repeatedly aired those complaints to the Board of Selectmen as of August 19, 2001, (if not months before), almost a full year prior to August 19, 2002, the date Town Manager Dean purported to fire her.  As for Testa's First Amendment activity in relation to the proposed reorganization and wage increase, that activity was decidedly less "dated" than Testa's other complaints and grievances.  Whether that activity was close enough, temporally, to support an inference that it played a substantial role in the Board of Selectmen's decision is a close question when viewed in light of the larger picture. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (holding that chronological proximity will not by itself establish causality where the "larger picture undercuts any claim of causation") (quoting Soileau v. Guilford of Me., 105 F.3d 12, 16 (1st Cir. 1997)).

The record reflects that Testa spoke out against the reorganization and wage proposal at a public meeting on April 2, 2002, between three and four months (15 weeks) prior to Dean's attempt to fire her.  Subsequently, on April 9 and April 22, 2002, Testa sent written plaints[2] to the Board of Selectmen concerning their decision to place the proposal on the ballot, complaining that the proposal would cause her to be demoted without cause.  These April complaints would bring her within a two-month, pre-termination window, but for the fact that they did not constitute protected activity.  In fact, the letters relate, exclusively, to Testa's concern that the proposal would, from her personal perspective, amount to a demotion.  Thus, unlike her public statements at the public meeting and her earlier oral and written complaints about preventing future embezzlement, the April 2002 letters relate "to only the effect an

---

[2]      Although Testa refers to these written complaints as "grievances," Testa fails to substantiate what adverse employment action was visited upon her as a result of the decision to place the proposal on the ballot.

employer's action has on the speaker [and are not] shielded by the First Amendment." <u>Wallscetti</u>
<u>v. Fox</u>, 258 F.3d 662, 667 (7th Cir. 2001).  Accordingly, for purposes of determining temporal
proximity, I consider the most recent protected activity to be Testa's public opposition to the
reorganization proposal at the town meeting in April 2002.

The probative value of a 15 week timeframe is not that appreciative.  But, as Testa points
out, the reorganization proposal went to the ballot in June and was turned down by the public.
Conceivably, losing at the ballot process could influence how the Board of Selectmen felt about
Testa's earlier opposition to the proposal.  On the other hand, Testa has not produced any
evidence that the Board of Selectmen was involved in Town Manager Dean's decision on July
19, 2002, to summarily attempt to terminate Testa.  Although Dean's act set in motion a process
that eventually led to Testa's discharge from employment by the Board of Selectmen, the timing
of Dean's act is not particularly probative of whether the members of the Board of Selectmen
harbored retaliatory animus on account of Testa's First Amendment activity.  Indeed, Testa
would be unable to prove on the existing record that Dean's summary firing of Testa came as a
result of a municipal policy because she denies that Dean had final decision-making authority
with respect to her position and there is no evidence capable of supporting a policy that the
Board of Selectmen authorized Dean to fire Testa.

I turn to consider the other circumstances argued by Testa.  The first of these is the Board
of Selectmen's alleged failure to address her June 2002 grievance.  Based on my review of the
record, it appears undisputed that the June 2002 grievance to which Testa refers was presented to
Town Manager Dean, not to the Board of Selectmen.  Additionally, if it somehow made its way
to the Board of Selectmen, which appears to be the case on or around July 1 (Def.'s Reply
Statement ¶ 134, citing Elias Dep. at 47-49), Testa was "terminated" by Dean on July 19 and

there is no basis in the record to understand how the Board of Selectmen would have taken

individualized action on the grievance within that timeframe.

The second piece of circumstantial evidence Testa raises is the Board of Selectmen's

failure to intercede on her behalf concerning her complaints of harassment despite being "aware"

that she "had gone home in tears due to the treatment she received."  The record reflects that

Testa's assertion of the board members' "awareness" of her emotional state is not supported by

her record reference.  Although she asserts that they were aware that she went home in tears on

one or more occasions, she cites only her own affidavit and that affidavit does not speak to the

Board of Selectmen's knowledge or awareness of Testa having "gone home in tears."  (Pl.'s Add'l

Statement ¶ 138, citing Testa Aff. ¶ 87.)  On the other hand, the record does reflect that the

Board of Selectmen ignored Testa's complaints of harassment and mismanagement, including

complaints that such harassment arose after she spoke out against the reorganization proposal.

Still, where the Town Manager has responsibility for office discipline and the day to day

management and operation of the town office, it dose not strike me as suspicious that a Board of

Selectmen, who must act by consensus and who hired the Town Manager to manage the town

office, did not attend to complaints about "snide and rude comments" or attempt to micro-

manage matters such as who signed municipal checks, prepared warrants and called the bank.  In

essence, Testa is trying to get to court on the basis of the squeaky wheel metaphor:  a squeaky

wheel is supposed to get the grease; if it does not, then circumstances are suspicious and an

inference of retaliatory animus must be drawn.  I am not persuaded that these circumstances are

suspicious enough to warrant the inference Testa advocates.

Next, Testa points to the fact that the Board of Selectmen voted to terminate her

employment rather than impose a warning or other, less serious, form of progressive discipline in

light of her employment history or record.  (Pl.'s Obj. at 24.)  On the issue of progressive

discipline, Testa has conceded that termination may be imposed for engaging in inappropriate,

improper or unprofessional conduct.  (Def.'s Statement ¶ 12; Pl.'s Opp'n Statement ¶ 12.)

Furthermore, the suggestion that the quality of her "employment record" called for less severe

discipline because of a lack of written reprimands or prior disciplinary measures is hard to

swallow in light of the fact that Testa seeks to build her case out of a year worth of conflict with

the Town Manager, his secretary, the Tax Collector and the Bookkeeper, virtually every official

with whom she worked during the timeframe relevant to this dispute, over various issues related

to internal office management and operation.[3]  Moreover, the parties have agreed that day to day

discipline was the responsibility of the Town Manager and that the Board of Selectmen were

more appropriately called upon to consider matters like whether Testa should continue to be

employed as the Town's treasurer.

Fourth, Testa asks, rhetorically, "Why didn't anyone reprimand her?  Why not let her go

sooner?"  These questions simply rehash the progressive discipline argument.  The parties agree

that Town Manager Dean had day-to-day authority to "discipline" Testa, though it appears he

chose not to impose formal discipline and to circumvent her to the extent possible, with respect

to the operation of the office.  I have already concluded in the context of the WPA claim that

there was nothing illegal in the manner by which Dean attempted to work around Testa rather

than through her.  Although this approach is distinct from a written reprimand, it is evident that

Testa considered it to be disciplinary in nature (although she would attribute it to illegal

---

[3]      There is evidence that Testa's working relationship with the previous town manager was also problematic,
although Testa asserts that this evidence was not considered by the Board of Selectmen in their decision to terminate
Testa's employment.  I cannot tell from my review of the summary judgment record exactly what evidence of this
prior relationship was presented during the hearing (there is no transcript in the record), but the majority of the
Board of Selectmen did find that "testimony supported that there [was] continuing tension and discord in the town
office [for] over two years."  (See Def.'s Statement ¶¶ 13-20; Pl.'s Opp'n Statement ¶¶ 13-20; Board of Selectmen
Decision, Docket No. 22, Elec. Attach. 11.)

motivation).[4]  As for the Board of Selectmen, the final decision-making authority concerning Testa's continued employment with the Town, the record does not support a finding that they were behind the Town Manager's unilateral attempt to terminate Testa following the verbal altercation with Gove.  Their consideration of the matter came afterwards, in response to Testa's grievance, and, to complicate matters further, their resolution of the matter was determined by a majority vote of three selectmen based on findings that can readily be supported by evidence presented during the underlying adversarial hearing.  How might a jury fairly impute an improper motive to these individuals, or a significant portion of them, so as to conclude that free speech retaliation was the Town's "official policy,"  Monell v. Dep't of Soc. Servs., 436 U.S 658 (1978), based on the timing of the Town Manager's acts?[5]  Testa attempts to justify such an inference based on two statements attributed to Chairman Elias.  The first of these statements was made at the opening of Testa's termination hearing, in the course of reading from the following list of issues:

- The difficult relationship between Ms. Testa and her direct supervisor . . ., including the lack of respect she reportedly has shown . . .;

- Ms. Testa's reported difficulty in accepting and complying with certain administrative decisions and policies that have been implemented in the Town Office, including but not limited to the re-organization of the office, the assignment of duties and other matters.

---

[4]     With respect to Testa's working conditions, something for which Dean would have had decision-making authority, Testa has not attempted to articulate with reasoned argumentation or citation to authorities how Dean's management measures or style caused her to suffer an adverse employment action.  For example, she does not argue that she experienced an adverse employment action in the form of a hostile work environment.  Nor does Testa present her retaliation claims in terms of whether any office reorganization measures actually imposed by Dean constituted a demotion in relation to the actual terms and conditions of her employment.  Indeed, the standards applicable to such a claim do not appear in her brief.

[5]     The Town has not suggested that Testa must prove that each member of the majority who voted in favor of ending her employment harbored a retaliatory motivation.  See Esperanza Peace & Justice Ctr. V. City of San Antonio, 326 F. Supp. 2d 433, 452-53 (W.D. Tex. 2001) (collecting cases and discussing when it is appropriate to impute to a legislative body the improper motivation of a minority block for purposes of assaying whether the improper motivation reflects "official policy").

- The difficult relationship between Ms. Testa and other employees in the Town Office;

- The incident that occurred on July 18, 2002 between Ms. Testa and another Town Office employee, Nancy Gove;

- The effect on the operation of the Town Office of the above issues.

Testa words her suspicion as follows: "Testa's opposition to the proposed reorganization was specifically included among the issues under consideration, as read at the outset of the September hearing by Chairman Elias." (Pl.'s Add'l Statement ¶ 208.) In her opposition memorandum, Testa asserts that inclusion of this issue "speaks volumes." (Pl.'s Obj. at 25.) I flatly disagree that the simple act of identifying the very issue that Testa was *then*, as now, alleging to be the motivation for her termination can be regarded as suspicious or probative of retaliatory motive on the part of the Board of Selectmen. In particular, Testa raised the issue of first amendment retaliation in a letter authored by her counsel shortly prior to the hearing. (Sept. 13, 2002, Letter from Atty. Adamson to Atty. McGill, Docket No. 38, Elec. Attach. 11.) Moreover, the manner in which the issue is worded reflects concern over Testa's failure to observe and follow administrative decisions and policies, not her public speech in opposition to the same.

The second statement Testa relies on is the one Chairman Elias allegedly made to Mr. Morey after the first day of the hearing was concluded: "I already know what the outcome is going to be." The question is whether this statement would permit an inference that Testa's first amendment activity was a substantial or motivating factor in the Board of Selectmen's decision to terminate her employment, assuming that the factfinder would find that the statement was made. Despite Testa's strident insistence to the contrary, I conclude that the factfinder would have to engage in speculation in order to make the requisite finding because the statement

suggests equally that Elias was convinced that a majority of the Board of Selectmen would find that the evidence related to Testa's ability to develop effective work relationships and respect the Town Manger did not favor Testa's continued employment with the Town.

In addition to the inherently speculative nature of Testa's evidence, also pertinent to the larger picture, particularly with respect to temporal proximity, are the facts (1) that Testa was very recently reappointed to her position by Town Manager Dean, even after she opposed the reorganization plan, and (2) that Dean's attempt to terminate Testa came directly on the heels of an altercation between Testa and Gove.  Although Testa maintains that she was disparately treated in this regard, the record is devoid of evidence of strife or discord between other workers in the office or of insubordinate and rude language being addressed to the Town Manager by any other workers in the office.  Beyond the matter of temporal proximity, but also serving to undercut an inference of retaliatory motivation, is the undisputed fact that Testa had an extensive history of conflict with her fellow office workers and addressed Town Manager Dean in an insubordinate and rude manner on repeat occasions.  In fact, even if the record presented by Testa could support an inference that her first amendment activity was a motivating factor in her termination, the record lacks any circumstantial evidence that would tend to call into question the legitimacy of the Board of Selectmen's decision to terminate Testa for her demonstrated inability to get along with her fellow town officials, for her rude and insubordinate manner toward the Town Manager, her supervisor, and based on the absence of any evidence of strife or discord between any other officials or employees in the office.  In effect, no reasonable juror could fail to find that Testa would have been terminated for her office conduct, even if her protected speech was a causative factor behind Dean's attempt to terminate her employment and, by extension,

caused the matter of her continued employment to be taken into consideration within two to four months following Testa's protected speech.

## CONCLUSION

For the reasons set forth above, I **RECOMMEND** that the Court **GRANT** the Town's motion for summary judgment on all claims (Docket No. 20).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: September 26, 2005